May it please the court, Appellant Thomas did not willfully obstruct justice, therefore the two-point enhancement should not have applied at his sentencing. The key word is willfully. I think the crux of this case is that there's just no evidence in the record that Blount or Thomas were together before trial and there's no evidence that Blount or Thomas prepared their testimony in some way, shape, or form. What you have is Blount testifying and Blount testifying in a way that is inaccurate. The inaccuracies in this particular case are not enough. Blount had been a drug dealer his whole life and the enhancement says specifically that you cannot give the enhancement as a result of confusion, mistake, or faulty memory. The testimony at trial was essentially that- In theory, I think the court found clearly that Mr. Blount's testimony did not help Thomas. Because this key link, I mean, you would think that one of the biases that would be explored by the government would be did you prepare your testimony with Mr. Thomas before you came to court today? That question was never asked and because that question was never asked, it's difficult to reach from the record that's presented whether or not Thomas and Blount somehow willfully got together and somehow managed this testimony in a perjurious fashion. And I would just state that these transactions that occurred a number of years previously, Blount had been a long-standing drug dealer dealing hundreds and hundreds and hundreds of times. And the key things that come out on cross-examination of Thomas to be specific was these tapes. The key thing that comes out in the cross-examination of Mr. Blount is that the government plays these tapes and during the playing of these recordings of these various conversations, Blount's memory is refreshed and Blount clearly says, well, now that I've heard this, I may remember things differently. Well, isn't the district judge entitled to use his power and determine credibility of that particular witness saying, well, my memory is refreshed, now I remember it? He is, absolutely, but there's a slight wrinkle here and I just want to point it out to the court. Generally, we apply this enhancement when a defendant gets up and tells a whopper and the judge looks at him and says, you know, you told a whopper, Mr. Defendant, and I'm going to charge you with two more points and give you obstruction of justice. What we have here is a different wrinkle. We have a guy named Blount who gets up and tells a whopper and it's not the defendant. The defendant is the attorney and you have a problem there. Will a pro se defendant ever be able to call a witness where every little miscue or every little mistake is somehow going to ... I don't think it was a little mistake. He knew what was going to happen. At least that was the opinion of the district judge. And I just don't ... I think that requires a tremendous number of inferences to get to that particular place. The primary inference being that somehow Thomas and Blount got together and rehearsed this testimony before it was presented in open court. Surely Mr. Thomas had some idea what Blount was going to say before he called him in his defense? It's inferential. It's not in the record. I mean, one question would have cured this problem for all time. Did you and Mr. Thomas ... I mean, it's an elemental form of cross-examination to explore the bias of a particular witness. You know, did you and Mr. Thomas prepare your testimony? Did you go over records before you came to court today? Those questions were never asked and you can only infer that the reason that they weren't asked is that there was some type of trial strategy that was being used by the government and they didn't want to ask that question. But now they're stuck with it. For the judge to say that he believes that they were on the same floor at the MCC, that's just clearly not enough under these circumstances, judge. Was that factually correct, though, that they were in the MCC together? I don't know. I don't know. I have no idea. I contested this at the sentencing hearing. There was no effort made to clarify or records brought in to clarify that they were in fact on the same floor or that they talked to each other or things along those lines. It was just that, you know, because these guys know each other, then they must have been in cahoots somehow and I don't think that's enough, sir. The second issue is, well, he says he'd known him for 30 years, right? On his blunts testimony that he'd known Thomas for 30 years? That's correct. But I mean, I don't know how much contact they had over 30 years. I could meet someone when I was in grade school and see him 30 years later and I would say I knew him. No, you would not say you've known the defendant for nearly 30 years if you hadn't seen him or talked to him for 30 years. You'd say you met him 30 years ago but you haven't seen him since, so you don't know him. Well, I don't know why that necessarily means that he gets an obstruction of justice enhancement. He's a pro se litigant, he's a lawyer, he's allowed to call witnesses, and I just think that if this is going to be the rule, that if every witness that's called by the defense is going to be scrutinized in minute detail. No, but we do give the district judges some credibility determination of witnesses, right? You do, but I still say that that was clear error because he says he believes that Thomas and Blount were on the same floor without any evidence. He just believes that. The second issue is related to pro se representation. Thomas' decision to represent himself pro se was not voluntarily. I just wanted to talk about the standard of review briefly. The standard of review has been abuse of discretion and also de novo at different times in the Seventh Circuit. I think that since United States v. Davila, I cited it in my brief, it's a 2013 Supreme Court case, was decided. I think the standard has to be de novo. You know, the denial of right to counsel is error. That is structural. Well, now how many times do you think he was entitled to be hiring and firing lawyers? What, do you have six? I think Mr. Branstetter was... Do you have to give a hundred or what? Well, you know, I think the standard, what's wrong with the standard is that... Well, it's absurd. You can't have a trial where the defendant hires and fires six lawyers or a dozen lawyers or 20 lawyers. I think Mr. Branstetter was the fourth lawyer, but I think that to apply numerical analysis just does not go deep enough. I think that if there is... So you think it could be 10 lawyers, it could be 20 lawyers? Well, if the 10th lawyer, if there's a substantial conflict, a substantial conflict that's brought... This is ridiculous. You never end the trial. He'll get up and say, well, I've had another conflict. I don't know. I don't get along with these people. I need another one. Maybe I'll get lucky on the 30th lawyer. No, you have to be realistic. Well, there is a real conflict is what I want to say between Branstetter and Thomas, and it revolves solely around this Bridges proffer, which is protected by a protective order. Thomas wants this to determine whether or not he is going to enter a plea of guilty or whether he's going to go to trial. He's not able to see this proffer from Mr. Bridges, the primary witness against him, and because he's not allowed to see that, he's not really able to make a wise decision about whether to go to trial or whether to plead guilty. The final order, the final real order... You don't seem to have any concern whatsoever for the need to get these trials over with, not spend months giving the defendant a chance to say, oh, I want to be pro se. No, I want a lawyer. No, I don't want this lawyer. Yeah, I'll take this lawyer again. No, I don't want him. It drives everybody crazy. Well, not everybody. It doesn't... Yeah, maybe he has less concern than others. It didn't drive this district judge crazy because he actually made four separate appointments of counsel. They were very short appointments. He was very patient with Mr. Thomas. Well, he's certainly different than most district judges I know who wouldn't have gone to four. Exactly. You're right, though. It doesn't mean if there's an impossible problem, that's one thing. But I don't understand the conflict over the Bridges proffer. He's not entitled to that before trial, is he? Well, he's not entitled to it because of a protective order that was entered by the judge. He's not entitled to see witness statements ahead of trial, right? He's not even entitled to know the government's witness list ahead of trial, is he? Well, I think that under the rules of discovery, he was entitled to Bridges proffer. I do think that. How? What are you relying on? Because he had received benefit for his testimony, so it would be provided. Does it have to be provided before trial? As a general rule in the district, it is provided three weeks before trial. As a matter of custom, correct? A matter of custom, yes, sir. Not as a matter of right under the federal rules of criminal procedure? Well, in order to, I mean, we talk about delay and unnecessarily delay. They could technically, I guess, provide it at the end of direct examination. But you can imagine what type of problems that would cause in the building if we had to continue each and every case. I know, counsel. I understand that. But in terms of whether Mr. Thomas had a legal right to the Bridges proffer, I don't see where that's a sound foundation for this sort of a right to a new lawyer. Well, it was one of the issues specifically that was addressed, and Judge Feinerman ordered specifically Branstrader to take the Bridges proffer over to Thomas and go over this proffer with him. And that issue is never resolved. And because it was never resolved, I don't think that the court's analysis, I mean, they kind of hit the high points of what you have to do for a Ferretta hearing. But I think, you know, in this particular situation, they should have dug deeper, unless anyone has additional questions. Okay. Well, thank you, Mr. Petroff. Thank you, Judge. And you were the fifth counsel in this case, correct? I was standby. I don't know if you heard me. Oh, okay. I was standby. Okay. Okay, thanks. But no longer. Mr. Haxel. Good afternoon, and may it please the Court. My name is Boling Haxel. I represent the United States. The district court did not abuse its discretion by declining to appoint the defendant a fifth different attorney, nor by accepting the defendant's request to represent himself at trial. With respect to the numbers question, Judge Posner, the judge was extremely patient, and he did not, in fact, say, this is number five, you're done. He actually went through a very involved inquiry with the defendant, trying to find out what his issues were with respect to Mr. Branstrader. The defendant didn't have any other than some general disagreements about a motion to dismiss the indictment that his attorney did not believe was appropriate, some discovery requests, and there was an order that the defendant could not take the proffer back with him to the MCC. As you might expect, we don't want cooperators' written statements and signed affidavits going back to the MCC where they can be passed around. But he was privy to the information, and he had a variety of other discovery materials. He had all of the overhear recordings. He had draft transcripts. Now, he complained that he didn't have final transcripts, but he actually had the recordings, the evidence themselves. In addition, Your Honor, the judge asked him at one point, is there any other basis for your dissatisfaction with your attorney? And the defendant came up with a general, I don't trust him. But under this court's prior rulings, that's not enough. He didn't come up with a specific reason for that distrust. And certainly, the record in this case and the record before the district judge was that they did have some degree of communication. Now, it was certainly strained at times, and to the extent there was limited communication, it was the defendant's refusal to meet with his own attorney, which he acknowledged to the district court he did. He said, I didn't meet with him. I don't want to communicate with him. That was the defendant's choice. And even throughout, his attorney said, I'll be ready for trial. He's got a triable case, although obviously he's making it more difficult than he should. There's no indication under Bjorkman that the breakdown was such that it prevented an adequate defense. Realistically, the district judge was amazingly patient with his defendant and repeatedly entertained his requests and kept an open mind about his requests for new counsel, even if it would have been his fifth. Now, with respect to the obstructing enhancement, the district court's factual determination that the defendant knowingly presented the false testimony of his co-defendant and friend of 30 years was not clearly erroneous. There are numerous references in the record that support the court's determination. Significantly, the defendant was present in the room when Domingo Blount pleaded guilty and refused to acknowledge the defendant's involvement in the drug trafficking organization. Mr. Blount's attorney initially, when he gave his factual basis, talked about the defendant Thomas' involvement. Blount refused to accept that and said, no, no, no, I won't talk about Thomas. Thomas was there? Thomas, they were both up. It was shortly before the scheduled trial. They were to both be tried together initially. Blount pled guilty. Thomas and Brian Strader were still in the room, and Blount said, I'm not going to implicate Charles Thomas. A short time later, Thomas' motion to continue his trial date explicitly made reference to Domingo Blount's refusal to implicate him. So it is clear at that point that the defendant absolutely knew that Blount was going to cover for him. But more importantly, as the district judge noted, he arranged for the defendant and Blount to be housed together so they could prepare for trial. Now, it's true we did not submit the MCC sheets showing they were on the same floor, but the district court statement is in the record. Again, these were gentlemen who were friends for 30 years, and it's preposterous to think that the defendant would have called his friend of 30 years to the stand to implicate him. Of course he knew that Blount was going to make statements on his behalf. And contrary to what counsel says, these aren't nitpicking statements. Mr. Blount said that Thomas was never present at these drug deals, never provided him security, and when he was cross-examined and confronted with recordings showing that Thomas was there, Blount changed his story and said, oh, he was there but just to pick up some money for me. He drove from the south side of Chicago all the way to the north side to get some money. He had nothing to do with the drug deals. The district court was well within its right to find otherwise, and it did. The court found that he was there, Thomas repeatedly, and he was there to participate in the drug deals. Unless the court has further questions for me, the government respectfully asks the court to affirm defendant's conviction and sentence. Okay, thank you, Mr. Axel. Mr. Petro, another minute? No, thank you, sir. Okay. Well, thank you, and, you know, we feel sorry for you having to be standby counsel. It's horrible. Thankless. But thank you for the role that you played. Okay, so that ends our day of arguments, and we will recess.